## DAVID LEBRECQUE *vs.* HILL MANUFACTURING COMPANY.

### Androscoggin.    Opinion October 8, 1908.

*Negligence.    Master and Servant.    Defective Leather Belt.*

When a person is employed in a mill to tend and operate a machine and the relation of master and servant exists between him and his employer, it is the primary duty of the master to use all ordinary care to provide a reasonably safe place in which the servant is required to work, and to provide and maintain reasonably safe and suitable machinery for the servant to operate, so that by the exercise of ordinary care on his part the servant can perform the service required of him without liability to other injuries than those resulting from simple and unavoidable accidents.

The plaintiff was employed as an operative in the picker room of the defendant's cotton mill, and while so engaged he received a severe personal injury causing a fracture of his right arm at three different points and resulting in the amputation of the arm near the shoulder. The plaintiff contended that the injury was caused by the breaking of a defective leather belt connecting two of the pulleys of the machine called an "opener" which he was employed to tend and operate, and that there was a failure of duty on the part of the defendant towards him in allowing a defective belt to be used and thus exposing him to unnecessary peril while he was himself in the exercise of ordinary care and without knowledge of the unsuitable condition of the belt. The plaintiff recovered a verdict for $3083.81. Under the facts and circumstances, which are stated in the opinion, *Held:* That the verdict cannot be deemed unmistakably wrong and that the court would not be warranted in setting it aside.

It is an axiom in mechanics that the fact that a belt breaks at a particular point is sufficient evidence that such point is the weakest place in the belt.

On motion by defendant.    Overruled.

Action on the case to recover damages for personal injuries sustained by the plaintiff while employed as an operative in the picker room of the defendant's cotton mill, and caused by the alleged negligence of the defendant.    Plea, the general issue.    The plaintiff recovered a verdict for $3,083.81.    The defendant then filed a general motion for a new trial.

The case is stated in the opinion.

*McGillicuddy & Morey*, for plaintiff.

*Oakes, Pulsifer & Ludden*, for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, SAVAGE, PEABODY, SPEAR, BIRD, JJ.

WHITEHOUSE, J.   On the fourth day of September, 1906, the plaintiff was employed as an operative in the picker room of the defendant's cotton mill, and while so engaged he received a severe personal injury causing a fracture of his right arm at three different points and resulting in the amputation of the arm near the shoulder.   In a suit brought against the company to recover damages for the injury, the plaintiff contended that it was caused by the breaking of a defective leather belt connecting two of the pulleys of the machine called an "opener" which he was employed to tend and operate, and that there was a failure of duty on the part of the company towards him in allowing a defective belt to be used and thus exposing him to unnecessary peril while he was himself in the exercise of ordinary care and without knowledge of the unsuitable condition of the belt.   The jury returned a verdict in favor of the plaintiff for $3,083.81, and the case comes to the Law Court on a motion to set aside this verdict as against the evidence.

In the picker room where the plaintiff worked, the preparatory processes of manufacturing appear to be carried on.   There the bales of cotton are opened and the cotton torn apart and subjected to some degree of manipulation.   It is then run through the machine called the "opener," for the purpose of lightening and cleansing it.   The entire machinery of the "opener" comprises a hopper where the cotton is introduced, the feed compartment with two aprons, a "chopper" or comb and a fan, and a beater with a wooden tunnel or hood attached through which a draft is forced for the purpose of drawing the cotton into another machine in the room above.   The beater is driven by power communicated by means of a belt from a large pulley overhead, and makes about 1350 revolutions a minute.   On the end of the beater shaft is a small pulley four inches in diameter, and the aprons, comb and fan in the feed compartment are all operated by power transmitted from the small pulley on the beater shaft by means of the belt in question, two inches in width, which is alleged to have been defective, to a pulley

eighteen inches in diameter with spokes in it revolving on an axle three or four feet distant from the beater shaft. This feed pulley, eighteen inches in diameter makes 292 revolutions a minute.

It is not in controversy that even with the exercise of ordinary care and skill in the operation of this machinery, the cotton running through the "opener" will occasionally become clogged either in the beater or in the tunnel through which the cotton passes from the beater. In such a contingency it may become necessary and proper either to stop all of the machinery constituting the "opener" or to stop only the feed pulley. In the former case a shipper is provided for the purpose of disconnecting the beater from the power overhead. This is known as the "big shipper," and it is equipped with a long wooden handle pendent within the reach of the operative when he is standing on the floor by the side of the machine. By thus "shipping the overhead belt" all parts of the machine may be stopped in about 22 seconds. The small shipper on the lower floor with the two iron prongs between which the belt in question passes in running over the feed pulley, is operated automatically by a wire rope from the room above, and was not designed to be used to take the belt off of the feed pulley by the operative on the lower floor. Whenever it is deemed advisable to stop the feed pulley without stopping the beater, the operative removes the belt from the feed pulley with his hand while the machine is in motion. By this method the motion of the pulley is stopped in about four seconds. It is not in controversy that when the plaintiff was employed fourteen months before the accident, he was instructed by Beauchene, the boss of the picker room, both by precept and example, to stop the feed pulley by removing the belt with his hand while the machine was in motion; and it is not in dispute that this had been the practical method of stopping the feed pulley for the entire fifteen years during which this machine had been used in the picker room. Overseer Mitchell, testifying for the defense, admits that Beauchene, the boss and belt fixer in that room was authorized to instruct the operators to stop the feed portion of the machine in that way, and Beauchene himself admits that he told the plaintiff that that was the way to do it, and gave him an illustration of his manner of doing it by taking

off the belt with his own hand while the machine was running at full speed. It is suggested, however, that Beauchene employed both hands to do it, using his left hand to steady the small automatic shipper and his right hand to take off the belt; but Beauchene expressly admits that if the belt breaks when the operative is in the act of removing it from the pulley "it will fly just the same whether he is taking it off with one hand or two." Although during the time the plaintiff was running the machine, the belt had broken several times prior to the day of the accident and had been repaired by Beauchene, there is no evidence that it had ever broken before while the operative was in the act of removing it; and during the entire fourteen months of the plaintiff's service in operating the machine whenever it became necessary to stop the feed pulley, the belt was removed by him in essentially the same manner as when he attempted to remove it at the time of the accident, and in every instance without injury to himself or the belt.

In the declaration in the plaintiff's writ, it is alleged that at the time of the accident the machine became clogged and that he attempted to stop it by removing the belt in question from the pulleys with his hand and took hold of the belt with his hand for that purpose; but while the machine and its pulleys were revolving with great speed, the belt in question "by reason of its worn, weak, defective and unsuitable condition," suddenly broke and with great force and violence came in contact with the plaintiff's right hand and arm and pulled his right hand and arm into the revolving pulleys and other parts of the machine and thereby broke, wounded and lacerated the arm, so that it became necessary to amputate it between the elbow and shoulder joint.

The plaintiff's account of the accident as given in his testimony, reduced to a narrative form, is as follows: "I was doing my work on the machine. I noticed the cotton was coming up bad in the tunnel. It was going up rolling and coming down, and I stopped the machine to get it out of the tunnel and see what the matter was. I did the same as usual, as was taught me. I stopped the big strap by the big shipper. Then I did as usual and went to take off the small one with my hand. While I was pulling it, it

broke. When I pulled the strap like this, it broke and threw my arm this way. I had my left hand on the belt trying to take it off. I was standing a step from the big pulley, where I generally stood. I was right close to it. I took hold of the belt with my left hand. My right hand was right side of me. The belt broke and I didn't know much of anything afterwards. I heard some noise and it went altogether,—the noise and myself who had the accident. It went as rapidly as lightning. I heard something crack, but at the same time I received everything. The machine was running at that time. It was moderating. I couldn't say how many turns. I heard the strap break and that is all I saw.

Q. Did it strike your hand? Did the belt strike or wind around your hand?

A. That is it. I thought it put me into the pulley. I couldn't see how it put me into the pulley. It went too fast. It put my right arm into the big pulley with spokes in it and broke my arm in three places.

In taking the belt off, I did nothing to break it. I always took it off the same way. It was the way they told me to take it off.

As I put my hand on the belt it broke and then it twirled and caught my right arm and pulled me into the pulley.

I could have stopped the machine when it was clogged by taking hold of the handle of the big shipper, but I couldn't wait; it had to be done immediately. It would have retarded the work. My reason for not waiting was to do the work faster; because we were ordered to do it that way. I took hold of the handle of the shipper because I didn't know (whether the cotton was clogged) in the tunnel or down in the beater.

The belt broke four or five days before I got hurt, before the last time. I was a little way off. We found it broken. That part of the machine was stopped. The belt had broken before, but a strap may break and be repaired so it will be just as strong as it was before. I didn't bother with the straps because it wasn't my business. I didn't doubt the strap. I thought it was good."

When the plaintiff was injured he was working on the machine alone. No other person witnessed the occurrence. But it was not

in question that immediately after the accident the plaintiff was found lying on the floor near the machine at which he had been at work, apparently unconscious with his right arm broken in three places, and a cut on his forehead, which was bleeding. The broken belt was lying on the floor near the pulleys, and "seemed to be twisted up in a circle." There was blood on the floor near the belt.

The principles of law applicable to this state of facts are well settled and familiar. They have been so repeatedly stated and critically distinguished and applied in the recent decisions of this court, that no elaborate discussion of them is here required. The relation of master and servant existed between the plaintiff and the defendant. It was the primary duty of the defendant to use all ordinary care to provide a reasonably safe place in which the plaintiff was required to work, and to provide and maintain reasonably safe and suitable machinery for him to operate, so that by the exercise of ordinary care on his own part, the plaintiff could perform the service required of him without liability to other injuries than those resulting from simple and unavoidable accidents.

In *Caven* v. *Granite Company*, 99 Maine, 278, the plaintiff's death was caused by the breaking of a defective eye in a wire cable into which the tackle had been hooked designed to support a movable stage. It was contended in behalf of the defense that the plaintiff was charged with the duty of the master to see that that part of the guy was sufficient for the purpose. But it appearing that this was a part of a completed structure furnished by the defendant for the use of its servants, and that the plaintiff was not expressly charged by the superintendent with any duty respecting it except to select good tackle and secure the guy to its anchorage, it was held that he assumed no risk and was guilty of no negligence. The question is thus treated in the opinion of the court: "If the appliances are of such a character as to be likely to become weak or worn or out of order by time or use, reasonable care requires the master to make examinations or inspections at reasonable intervals, in order that defects may be discovered and remedied. And the servant has a right, so far, to rely upon the presumption that the master has done its duty in all these respects. The servant on his

part is bound to use reasonable care. He is conclusively held to have assumed the risks of dangers which are known to him, and as well, those which are incident to his work and which are obvious and apparent to one of his intelligence and experience. Though he may have the benefit of the presumption that his master has performed its duties, yet he is bound to use his eyes and his mind, and to see the things before him which are obvious. He is chargeable with knowledge of the things and conditions which he sees or ought, by the exercise of reasonable care, to see. And the master has a right to presume that he will see and guard against obvious dangers. If the servant fails in this respect, he is negligent. But he is not ordinarily bound to examine or inspect appliances, or to discover dangers not obvious. He is not bound to do so, unless charged with that duty by the master, or by the character of his work. He may rely upon the presumption that the master has inspected."

That the belt in question in the case at bar was in fact defective and of insufficient strength to transmit the power and maintain the velocity required of the feed pulley in the machine operated by the plaintiff, satisfactorily appears from the testimony in the case considered in connection with the appearance of the belt itself which is exhibited in evidence. The jury so found, and there is a clear preponderance of evidence in support of their finding upon that proposition.

The jury also found that the defendant failed to exercise due care and vigilance in regard to the inspection of this belt, and neglected to provide the machine with a reasonably safe and suitable belt, and it is the opinion of the court that this conclusion cannot justly be declared manifestly wrong. The testimony of Beauchene himself, who was charged with the duty of the master to make the necessary inspection and repair of the belts in the plaintiff's room, discloses an unexplained neglect of duty on his part to make proper inspection, and a manifest failure to appreciate the nature and extent of the responsibility imposed upon him. He expressly admits in his testimony that he made no inspection to discover

defects. He say: "I leave the belt to run all he can run. I find out if he break I fix him up. If my man find out he want fix, he tell me to fix it.

Q. Let it go as long as it would until it broke and then you would fix it? That is right isn't it Mr. Beauchene?

A. Yes.

Q. You didn't take the trouble to go around and look at the belt and see how it was?

A. No.

Q. Now if you saw a crack in a belt like that, wouldn't you cut that out too?

A. If I see him, I fix the belt.

Q. If you saw it you wouldn't let the belt run that way, would you?

A. No.

Q. And that was just the way this belt was running when this belt broke, wasn't it? That is true, isn't it?

A. Well it is supposed to be run that way."

This man had worked in a picker room twenty-two years, and had served in the plaintiff's room the last time for four consecutive years immediately preceding the accident. According to the plaintiff's testimony the belt broke and was repaired by Beauchene only four or five days before the last break. This is not denied by Beauchene. He only states that he doesn't remember when he last repaired it. Beauchene then knew that the belt was in use when he took charge of the room four years before but did not know how much longer it had been there. If he had then given the belt such a careful examination as his duty required him to give it, and compared the patent defects in the other portions of it with the condition of the broken ends, he would doubtless have condemned the belt as no longer safe and suitable for use. The plaintiff had only been there fourteen months, and had no knowledge of the age of the belt. He had never been charged with any responsibility in the inspection of belts and never had any experience in testing or specially observing the tensile strength of leather which had become cracked and weakened by time and use. The surface cracks were

obvious, but they were not necessarily serious defects. The plaintiff was not sufficiently expert to distinguish at a glance harmless surface cracks from the destructive rents caused by great age and hard usage. He was justified in assuming that the decision of the belt fixer, Beauchene, to continue this belt in use after the repairs made by him four or five days before the accident was a sufficient guaranty of its strength and fitness. He could properly rely upon the presumption that the duty of the master had been performed. He says he "did not doubt the belt;" he "thought it was good." Under these circumstances the conclusion of the jury that the plaintiff assumed no risk and was guilty of no negligence in removing the belt as he had been instructed to do and as he had safely done for fourteen months prior to that time, cannot be deemed manifestly wrong.

But it is earnestly contended in behalf of the defendant that the plaintiff's account of the manner in which his injuries were received is so improbable and so discredited by the evidence, that it ought to be rejected as incredible and essentially untrue. It is argued that the belt did not break in a defective or the weakest place, and that the breaking of the belt did not cause the accident. It is suggested as a more probable theory of the plaintiff's injury that in his haste to remedy the difficulty caused by the apparent clogging of the cotton in the tunnel, he slipped and plunged his right arm into the feed pulley or under the belt, and that the breaking of the belt was the effect and not the cause of his accident.

There is unquestioned plausibility in the theory thus suggested but it appears to be founded wholly upon conjecture and not upon evidence. It will be remembered that the feed pulley 18 inches in diameter, was capable of 292 revolutions a minute, and allowing for some reduction of speed after disengaging the power overhead, it was doubtless making more than 200 revolutions a minute at the moment of the accident. The plaintiff says, "I did as usual and went to take off the small strap with my hand. While I was pulling it it broke, and I didn't know much of anything after-wards. . . . It went as rapidly as lightning. . . . . The belt broke and then it twirled and caught my right arm and

pulled me into the pulley. I couldn't see how it put me into the pulley. It went too fast." This is a succinct account of an exciting occurrence which inflicted upon the plaintiff a grevious injury and rendered him unconscious. All the incidents involved in it were comprised within a single instant of time; and it is difficult to conceive how a more definite or precise statement of the manner in which his arm was drawn into the pulley, or a more detailed account of the occurrence could truthfully be given by the victim. This version of the accident given by the plaintiff is not contradicted by any direct evidence in the case, and does not appear to be essentially discredited by circumstances or improbabilities.

With respect to the suggestion that the belt did not break in the weakest place, it is only necessary to observe that the diagonal course of the rupture across the leather and the appearance of the broken ends of the belt are wholly inconclusive evidence both of the cause of the breaking and of the strength of the belt at that point in comparison with other obviously weak places in it. There is no controlling circumstance to show that all parts of the tense side of the belt which was carrying the load at the moment of the accident were not subjected to an equal strain and if so it is an axiom in mechanics that the fact that the belt broke at a particular point is sufficient evidence that that point was the weakest place in it.

The further suggestion that the plaintiff may have put his hand between the belt and revolving pulley, and thus caused the belt to break utterly fails to account for the fact that the arm was broken and twisted in three different places, extending from the wrist to a point near the shoulder, for the reason that the arm would in that event be on the outside of the pulley and not between the spokes. The condition of the arm when the plaintiff was found by the side of the machine after the accident, tends to corroborate the plaintiff's account of his injuries.

It is finally contended that it is impossible that the plaintiff's right arm could have been drawn between the spokes of the pulley by the twirling of the end of a broken belt, according to the plaintiff's theory. But in answer to an inquiry, the defendant's witness Buchanan, a second hand with twenty years' experience having jurisdiction of the picker rooms thus testifies:

Q.   Is there any telling what direction a belt will go when there is an accident on the machine and it breaks?

A.   I could hardly tell which way a belt will go.

Q.   If it is around the shaft and in any way it gets caught in the spokes of a pulley, wouldn't that be likely to carry it around with the pulley and twirl it?

A.   If it is caught in the spokes it would be apt to.   I don't see how it could do any other way.

It has been noticed that the plaintiff has not assumed to know or to state precisely how his arm was drawn into the pulley, but it affirmatively appears from his account of the accident that he was in the exercise of ordinary care and that in some way the breaking of the belt was the proximate cause of his injuries.   The jury saw him and judged him.   They decided that his description of the occurrence was a truthful statement and not a fraudulent invention. They found that his account of it was not so inherently unreasonable and improbable and not so overborne by established facts and circumstances that they could not accept it as the basis of their verdict.   They rendered their verdict in accordance with it, and the question now presented to the court is "whether this conclusion could be arrived at by fair minded men by any reasonable inference from the evidence, even though other and contrary inferences might seem to us more reasonable."   "To set aside the verdict of a jury is to say that the inference drawn by the jury is indisputably wrong,— that no such inference can fairly be drawn by any fair minded men,— that the contrary inference is not only the more reasonable inference, but is the only reasonable inference."   *York* v. *Me. Cen. Railroad Co.*, 84 Maine, 117.   The verdict of the jury in this case cannot be deemed unmistakably wrong and the court is not warranted in setting it aside.

*Motion overruled.*